IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 05–cv–02452–EWN–CBS


KATHLEEN KLEN,

      Plaintiff,

v.

COLORADO STATE BOARD OF AGRICULTURE, a public entity operating
Colorado State University;
COLORADO STATE UNIVERSITY, a Colorado public institute of higher education;
JAY KAMMERZELL, Plaintiff's employment supervisor at the Colorado State
University,

      Defendants.

_____

**ORDER AND MEMORANDUM OF DECISION**
_____

      This is an employment discrimination case.  Plaintiff Kathleen Klen alleges Defendants

Board of Governors of the Colorado State University System, Colorado State University

("CSU"), and Jay Kammerzell discriminated against her on the basis of her sex and retaliated

against her for engaging in protected activity in violation of Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e, *et seq.* (2006) ("Title VII"), and the Equal Protection and Due Process

Clauses of the United States Constitution.  This matter comes before the court on "Defendant's

Motion for Summary Judgment," filed September 13, 2006.  Jurisdiction is premised upon the

existence of a federal question pursuant to 28 U.S.C. §§ 1331, 1367 (2006).

**FACTS**

*1.      Factual Background*

Plaintiff worked as a medical transcriptionist in the Business Office of the Diagnostic Laboratory in the College of Veterinary Medicine at CSU (hereinafter "Business Office") from August 11, 2003 through September 8, 2004.  (Defs.' Mem. of Law in Supp. of Their Mot. for Summ. J., Statement of Undisputed Material Facts ¶¶ 1–2 [filed Sept. 13, 2006] [hereinafter "Defs.' Br."]; *admitted at* Pl.'s Resp. to Mot. for Summ. J., Objection to Statement of Undisputed Facts ¶¶ 1–2 [filed Oct. 20, 2006] [hereinafter "Pl.'s Resp."].)  Jay Kammerzell was the Business Manager of the Diagnostic Laboratory and Plaintiff's direct supervisor from August 2003 until late 2003, and then again from June 2004 until the end of her employment.  (*Id.*, Statement of Undisputed Material Facts ¶¶ 3–5; *admitted at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶¶ 3–5.)  Lisa Monzingo, the Assistant Business Manager of Diagnostic Laboratory, was Plaintiff's direct supervisor from late 2003 until June 2004.  (*Id.*, Statement of Undisputed Material Facts ¶ 5; *admitted at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶ 5.)

Monzingo provided Plaintiff's only performance evaluation.  (Pl.'s Resp., Ex. 20 [Evaluation].)  She rated Plaintiff as "very good" or "outstanding" in all categories except interpersonal relations, for which she rated Plaintiff as "good."  (*Id.*)  Monzingo considered Plaintiff to be a very good transcriptionist who kept her "nose to the grindstone."  (*Id.*, Pl.'s Contested Facts ¶ 26; *admitted at* Defs.' Reply Br. in Supp. of Motion for Summ. J., Resp. Concerning Disputed Facts ¶ 26 [filed Nov. 13, 2006] [herinafter "Defs.' Reply"].)

The Business Office is housed in a modular trailer outside of the Veterinary Hospital, in which the employees worked in very close quarters.  (Defs.' Br., Statement of Undisputed Material Facts ¶¶ 6–7; *admitted at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶¶ 6–7.)  At all relevant times, all employees who worked in the Business Office and under Kammerzell's supervision were female.  (*Id.*, Statement of Undisputed Material Facts ¶¶ 8–9; *admitted at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶¶ 8–9.)

    a.    *Plaintiff's Interpersonal Problems with Her Co-Workers*

Plaintiff had pervasive interpersonal problems with her co-workers.  (*Id.*, Ex. D *passim* [Pl. Dep.].)[1]  She identified her first and second monthly lab meetings as marking the beginning of her interpersonal issues.  (*Id.*, Ex. D at 4–5 [Pl. Dep.].)  At these meetings, Dr. Barb Powers, the director of the Diagnostic Lab, publicly complimented Plaintiff's work.  (*Id.*, Ex D at 4 [Pl. Dep.].)  After receiving these compliments, Plaintiff found that several Business Office employees became "cold," "accusatory," and "abusive" in their interactions with her.  (*Id.*, Ex. D at 4–5 [Pl. Dep.].)  Plaintiff felt two other medical transcriptionists, Tina Little and Elaine Anderson, were

---

[1]I cite directly to Plaintiff's deposition frequently, because Plaintiff plays fast and loose with this court's procedural rules throughout her response brief.  (*See* Pl.'s Resp.)  Instead of properly supporting her denials of the facts alleged by Defendants, Plaintiff rephrases or embellishes the facts, often without record support.  (*See* Practice Standards—Civil, Special Instructions Concerning Motion for Summary Judgment ¶ 4 [requiring that any party opposing a motion for summary judgment "admit or deny the asserted material facts set forth by the movant," and that "[a]ny denial shall be accompanied by a *brief* factual explanation of the reason(s) for the denial and a *specific reference* to material in the record supporting the denial"] [emphasis in original].)  Thus, I rely heavily on Plaintiff's own words, rather than Plaintiff's attorney's confusing and often misleading rendition of the facts in the response brief.  Although Defendants deny the majority of Plaintiff's allegations, I presume Plaintiff's plausible allegations to be true for the purposes of this motion.  *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998)

jealous of her for receiving these compliments, and that — as a result — they arranged for Plaintiff to receive more difficult assignments.  (*Id.*, Ex. D at 103–04 [Pl. Dep.].)  Plaintiff felt several Business Office employees, including Little and Anderson, were talking about, pointing at, and laughing at her behind her back.  (*Id.*, Ex. D at 20 [Pl. Dep.].)

Plaintiff also felt excluded and rejected by many of her co-workers and opined that may have been "because I wasn't part of their clique."  (*Id.*, Ex. D at 19, 21–22 [Pl. Dep.].)  Plaintiff explained that her co-workers dressed up daily and spent a lot of time talking about "women" topics — "such as cooking, husbands, children, planning weddings and showers and talking about clothes, gossiping and whispering about people they did not like."  (Pl.'s Resp., Ex. 2 ¶ 1 [Pl. Aff.]; *id.*, Pl.'s Contested Facts ¶ 24; *denied at* Defs.' Reply, Resp. Concerning Disputed Facts ¶ 24.)  Plaintiff explains:

> I could not talk about the feminine subjects they enjoyed, as I did not know what they were talking about.  I was shunned when I tried to talk to them.  I have never been married, I have no children and wear clothes such as sweatshirts, baggy pants and work boots.  I am neither svelte nor fashionable and I am a farm woman without a television.  My hygiene is good and I have clean clothes.  I do not smell. I had no idea of what to say to these women, but I tried to join when they were talking about work.  Jennifer Swenson[, another Business Office employee,] and Tina Kane just told me their conversation was about work that was none of my business.

(*Id.*, Ex. 2 ¶ 3 [Pl. Aff.].)  According to Plaintiff, her co-workers told her she should "dress nicer," and Tina Kane said that if Plaintiff did not "fit in" she "would be gone." (*Id.*, Ex. 2 ¶¶ 2, 4 [Pl. Aff.].)

Plaintiff depicts her co-workers as behaving in a kindergarten-like fashion.  They said her shoes smelled like dog poop and grunted at her like a pig.  (*Id.*, Ex. 2 ¶ 5 [Pl. Aff.].)  They often

flew off the handle and cried or became angry at a phone call, and then ran out of the Business Office door.  (Defs.' Br., Ex. D at 23 [Pl. Dep.].)  They had a rubber penis that they hid in a desk and would throw around the office from time to time, but they never tossed it to Plaintiff.  (*Id.*, Ex. D at 23–24 [Pl. Dep.].)  After Plaintiff had received a compliment at the first month's lab meeting, several co-workers began throwing paper clips, pen caps, and rubber bands at her.  (*Id.*, Ex. D at 25–27 [Pl. Dep.].)  One co-worker purposefully pulled Plaintiff's hair unprovoked.  (*Id.*, Ex. D at 102 [Pl. Dep.].)  Plaintiff's co-workers also threw pens and paper clips at one another and would "grunt at each other."  (*Id.*, Ex. D at 27 [Pl. Dep.].)  Plaintiff "got the impression that [her co-workers] didn't like each other."  (*Id.*)  She explained:

> They would be, like, all friendly to each other.  And as soon as one of them walked out of the office, they're all talking about them, stabbing them in the back, cutting them down about their kids, their husband, their life, that they're stupid, things like that.  As soon as they came back in, they were all friendly to each other.  And they did that to each other.

(*Id.*)  Some of Plaintiff's co-workers called her names such as "asshole, bitch, slut," and "f'ing loser."  (*Id.*, Ex. D at 28 [Pl. Dep.].)

Plaintiff recounted the following interactions with Little, who shared a small office with Plaintiff until Little quit.  Little flicked her hands in Plaintiff's face, called her an "f'ing loser," and said "you're not worth it."  (*Id.*, Ex. D at 5–6 [Pl. Dep.].)  Plaintiff suggested talking to Kammerzell regarding problems between Little and herself, but Little said, "Oh he's not going to do anything."  (*Id.*, Ex. D at 6 [Pl. Dep.].)  Further, Little told Plaintiff that the sweat pants she wanted to wear to work were within the dress code when they actually were not.  (*Id.*, Ex. D at 8 [Pl. Dep.].)

Plaintiff recounted the following interactions with Janet Bigler, another medical transcriptionist who shared an office with Plaintiff after Little quit.  (*Id.*, Ex. D at 10–15 [Pl. Dep.].)  Plaintiff and Bigler had a "fine" relationship until Bigler came back from a vacation with Anderson, at which point Bigler became "cold," "ugly," and "abusive" toward Plaintiff.  (*Id.*, Ex. D at 10 [Pl. Dep.].)  Plaintiff perceived Bigler and Anderson to become "very friendly" and opined that Anderson turned Bigler against Plaintiff.  (*Id.*, Ex. D at 10–11 [Pl. Dep.].)  Plaintiff said Bigler and Anderson would "stand and whisper . . . and look at me to see if I was looking. And they would exclude me from things."  (*Id.*, Ex. D at 11 [Pl. Dep.].)  Bigler told Plaintiff that Kammerzell said she did not have to talk to Plaintiff.  (*Id.*, Ex. D. at 11–12 [Pl. Dep.].)  Bigler may have also said, "You're not worth it."  (*Id.*)  Bigler said these things in an "explosive manner," pointing and yelling at Plaintiff.  (*Id.*, Ex. D at 12–14 [Pl. Dep.].)  Bigler would bump Plaintiff's chair, "snap" her neck, rip paper slowly behind Plaintiff's head while she was transcribing, stand and watch Plaintiff work while making comments such as, "Oh, is that what you're doing," and lean over Plaintiff and bump into her shoulder.  (*Id.*, Ex. D at 14–15 [Pl. Dep.].)  On one occasion, Bigler had Plaintiff walk under her arm and then lowered her arm on Plaintiff's head.  (*Id.*, Ex. D at 15, 25–25 [Pl. Dep.].)

Plaintiff recounted the following interactions with Anderson, with whom Plaintiff had a "stressful" and "deceitful" relationship.  (*Id.*, Ex. D at 16 [Pl. Dep.].)  The relationship was "deceitful" because Anderson "would tell [Plaintiff] the wrong things to do, and then [Plaintiff] would do it; and then [she] would get called down [by Kammerzell] on it."  (*Id.*)  According to Plaintiff, Anderson was initially picked on by her co-workers and was called "manly because she

wore clothes like [Plaintiff] and short hair." (*Id.*, Ex. D at 35 [Pl. Dep.]; Pl.'s Resp., Ex. 2 ¶ 2 [Pl. Aff.].) Anderson then allegedly became friendlier with her co-workers when she and Little began to "dress up together." (Pl.'s Resp., Ex. 2 ¶ 2 [Pl. Aff.].)

Plaintiff said her relationship with Swenson, was "sometimes okay." (Defs.' Br., Ex. D at 17–18 [Pl. Dep.].) Once, Swenson stood over Plaintiff "very angrily" and yelled at her because she believed Plaintiff had wrongfully accused Bigler of stealing paper. (*Id.*, Ex. D at 18 [Pl. Dep.].) Swenson characterized Plaintiff as a liar because she and others believed the soup Plaintiff brought to share with her co-workers was not homemade, as Plaintiff claimed, but had the consistency and taste of Campbell's. (Pl.'s Br., Pl.'s Contested Facts ¶ 52; *admitted in relevant part at* Defs.' Reply, Resp. to Disputed Facts ¶ 52; *id.*, Ex. 7 at 10 [Swenson Dep.].) Plaintiff avers that her soup was in fact  homemade. (*Id.*, Pl.'s Contested Facts ¶ 52; *denied in relevant part at* Defs.' Reply, Resp. to Disputed Facts ¶ 52.)

Plaintiff felt she bore little if any personal responsibility for her interpersonal conflicts with her co-workers. (Defs.' Br., Ex. D. at 9–10, 13, 17 [Pl. Dep.].) Plaintiff met with Monzingo, Kammerzell, and Mary Ann Valdez, a human resources liaison for the College of Veterinary Medicine, to discuss and try to resolve the disputes between herself and her co-workers. (*Id.*, Statement of Undisputed Material Facts ¶¶ 17–18, 22; *admitted at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶¶ 17–18, 22.) She may have complained to Kammerzell or Monzingo that her co-workers would "stand behind me and point at me and laugh.  Then when I turn around, they would, like, run — not run, but all of the sudden walk away." (*Id.*, Ex. D at 21 [Pl. Dep.].) She alleges to have complained to Kammerzell, Valdez, and Lorie Smith, the

Employee Relations Manager for CSU, that her co-workers threw things at her.[2]  (*Id.*, Ex. D at 26 [Pl. Dep.].)  Plaintiff complained to Kammerzell that she was physically afraid of Bigler.  (*Id.*, Ex. D at 25 [Pl. Dep.].)  Monzingo, who spoke with Little and Plaintiff about their problems with one another, did not determine that one party was more at fault than the other.  (Pl.'s Resp., Pl.'s Contested Facts ¶ 48; *admitted in relevant part at* Defs.' Reply, Resp. to Disputed Facts ¶ 48; *id.*, Ex. 8 at 2 [Monzingo Dep.].)

Plaintiff estimates she met with Valdez, whom she trusted, twenty to twenty-five times beginning in December 2003 to discuss her interpersonal problems with co-workers and Kammerzell, including strategies for dealing with those problems and opportunities to transfer to other positions within CSU.  (Defs.' Br., Statement of Undisputed Material Facts ¶¶ 27, 29; *admitted at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶¶ 27, 29; *id.*, Ex. D at 60 [Pl. Dep.].)  Valdez told Plaintiff that Kammerzell viewed her as a "tattletale," and that he had been with CSU long enough that "if he want[ed] to get rid of [Plaintiff], he [would] find a way to get rid of [her]."  (*Id.*, Ex. D at 115 [Pl. Dep.].)

Plaintiff also met with Smith on numerous occasions to discuss her interpersonal issues with co-workers and Kammerzell.  (*Id.*, Statement of Undisputed Material Facts ¶ 33; *admitted at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶ 33.)  Plaintiff complained to Valdez and Smith about the lack of efficiency in the Business Office and the fact that the animosity between co-workers and herself was not being resolved.  (*Id.*, Ex. D at 290–91 [Pl. Dep.].)

---

[2]Kammerzell, Valdez, and Smith all deny Plaintiff made such complaints.  (Defs.' Br., Ex. A ¶ 16 [Kammerzell Dep.], Ex. J ¶ 8 [Smith Dep.], Ex. Y ¶ 5 [Valdez Dep.].)

### b.    *Plaintiff's Interpersonal Problems with Kammerzell*

Plaintiff also alleges that Kammerzell harassed her.  (*See* Pl.'s Br.)  The most extreme

incident between Plaintiff and Kammerzell occurred in early 2004, when Plaintiff alleges

Kammerzell stormed into her office and yelled at her that Little was going to quit because of her.

(Defs.' Br., Ex. D at 36–41 [Pl. Dep.].)  Plaintiff, whose description of the event has morphed

over time from a physical altercation — in which Kammerzell actually hit her— to a wholly non-

physical one, described the incident as follows in her deposition:

> I was sitting at my desk transcribing, just doing my usual thing.  All of the sudden,
> I hear the door slam to our little office, the transcription office.  And I looked
> back, and [Kammerzell] was hovering over me.  And he started yelling at me and
> pointing in my face, accusing me of things and swinging his fist in my face and
> saying: Tina Little's in my office right now, in tears, ready to quit.  And if anyone
> is out of here, you are out of here.

(*Id.*, Ex. D at 37 [Pl. Dep.]; *see* Pl.'s Resp. to Def.'s [sic] Interrogatories and Requests for

Admissions ¶ 9 [filed Sept. 13, 2006].)  Plaintiff now admits that Kammerzell never physically hit

her.  (Defs.' Br., Ex. D at 42 [Pl. Dep.].)  Although Plaintiff consistently denied having reported

Kammerzell's "assault" to Valdez, she claimed during the last day of her deposition, to have told

Valdez about it.  (*Id.*, Ex. D at 116 [Pl. Dep.].)  Valdez denies Plaintiff ever told her of an

incident in which Kammerzell pointed a finger in Plaintiff's face or swung his fist at her.  (*Id.*, Ex.

Y ¶ 5 [Valdez Dep.].)

Plaintiff recollects only one other incident when Kammerzell screamed at her.  (*Id.*, Ex. D

at 112–13 [Pl. Dep.].)  She alleges that in early 2004, Kammerzell yelled at her in front of her co-

workers, telling everyone in the Business Office that they needed to do "a special thing with the

computer" to produce a certain kind of report, though Plaintiff denies she had been previously

told to do this "special thing."  (*Id.*)  Plaintiff alleges Kammerzell screamed at other females in the

department, including his boss, Dr. Powers.  (*Id.*, Ex. D at 42–43 [Pl. Dep.].)  Both Kammerzell

and Dr. Powers deny that Kammerzell ever screamed at Dr. Powers or other employees.  (Pl.'s

Resp., Ex. 6b at 4–5 [Kammerzell Dep.], Ex. 11 at 7 [Powers Dep.].)

Plaintiff also asserts that Kammerzell made the following gender-related comments.  He

told Plaintiff that Monzingo would be her supervisor for a while, because he thought the issues in

the office were "a woman thing."  (Defs.' Br., Ex. D at 32–33 [Pl. Dep.].)  Additionally, at some

point Kammerzell rolled his eyes and said, referring to the employees of the Business Office,

"These women are driving me crazy."  (*Id.*, Ex. D at 35–36 [Pl. Dep.].)  Further, Plaintiff claims:

> Kammerzell spent much of his time in his office with a glazed look in his eyes,
> completely bored.  He was not interested in the management of his female
> secretaries and transcriptionists.  He slumped over his desk and acted grouchy
> when I saw him.  He seldom paid attention to what any of the females were doing.
> On the other hand, he seemed to enjoy his interactions with the men in the
> department and spent a lot of time joking and talking and looking interested in
> them.  He did not like women unless they were hanging out in his office with
> problems.

(Pl.'s Resp., Ex. 2 ¶ 7 [Pl. Aff.].)

Every two or three weeks, Plaintiff complained to Kammerzell about harassment by her

co-workers.  (Defs.' Br., Ex. D at 43–44 [Pl. Dep.].)  According to Plaintiff, Kammerzell did not

work to resolve these conflicts.  (*Id.*, Ex. D at 52 [Pl. Dep.].)  Plaintiff felt Kammerzell was

unresponsive to her complaints, but would allow Little, Bigler, and Anderson to sit in his office

and cry and complain about Plaintiff, though Plaintiff does not claim to have been present for any

of these crying sessions.  (Pl.'s Resp., Ex. 2 ¶ 6 [Pl. Aff.].)  Under Monzingo's supervision,

Plaintiff felt her concerns still often fell on deaf ears.  (Defs.' Br., Ex. D at 34 [Pl. Dep.].)

Plaintiff explained: "[Monzingo] said [Kammerzell was] still her supervisor.  It was almost like

she had her mind made up, and sometimes didn't even care what I had to say."  (*Id.*)

Kammerzell asked Little to keep a diary of her interactions with Plaintiff.  (Pl.'s Resp.,

Pl.'s Contested Facts ¶ 10; *admitted in relevant part at* Defs.' Reply, Resp. Concerning Disputed

Facts ¶ 10.)  Kammerzell did not seek Plaintiff's version of the facts because he felt Little — as a

long-term employee — deserved "more credence."  (*Id.*, Pl.'s Contested Facts ¶ 11; *admitted in*

*relevant part at* Defs.' Reply ¶ 11.)

   *c.*     *The Corrective Action*s

On June 28, 2004, Kammerzell issued Plaintiff a corrective action which directed her to

improve in the areas of "interpersonal relations" and "working relationships with other word

processors and office staff."  (Defs.' Br., Ex. V [First Corrective Action].)  Further, Plaintiff was

to:

> Stop creating a hostile work environment by use of physical and verbal
> intimidation. . . .  Stop "shopping" for answers by asking different office staff the
> same questions to find some one [sic] to blame, ask you supervisor.  Stop the
> "they are talking behind my back" paranoia in your dealings with other staff.

(*Id.*)  Plaintiff contends that Kammerzell "grinned at her" when he handed her the corrective

action and told her to take it home and read it.  (*Id.*, Ex. D at 46 [Pl. Dep.].)  Plaintiff met with

Kammerzell and Valdez to informally grieve the first corrective action.  (*Id.*, Statement of

Undisputed Material Facts ¶ 22; *admitted at* Pl.'s Resp., Objection to Statement of Undisputed

Facts ¶ 22.)  On July 26, 2004, Kammerzell withdrew the first corrective action, noting Plaintiff

had made "some improvement" in the problem areas.  (*Id.*, Ex. H [7/26/04 Mem.].)

On August 16, 2004, Kammerzell told Plaintiff to turn in her key but did not state why.

(Pl.'s Resp., Ex. 2 ¶ 15 [Pl. Aff.].)  On August 17, 2004, Kammerzell issued Plaintiff a second

corrective action regarding Plaintiff's scheduled hours.  (Defs.' Br., Ex. W [Second Corrective

Action].)  Prior to July 2004, Plaintiff's hours were Monday through Friday from 7:00 A.M. to

3:00 or 3:30 P.M.  (*Id.*, Statement of Undisputed Material Facts ¶ 37; *admitted at* Pl.'s Resp.,

Objection to Statement of Undisputed Facts ¶ 37.)  Defendants allege that, on July 26, 2004, due

to Dr. Powers' request that the Business Office provide transcription services later in the

workday, Kammerzell directed Plaintiff and Bigler to work out a schedule that would provide

transcriptionist coverage until 5:00 P.M. on Monday through Friday.  (*Id.*, Statement of

Undisputed Material Facts ¶¶ 38–40; *denied at* Pl.'s Resp., Objection to Statement of Undisputed

Facts ¶ 38–40; *id.*, Ex. W [Second Corrective Action].)  Both parties agree that: (1) Kammerzell

told Plaintiff that he wanted her to work until 5:00 P.M. on Mondays, at minimum; and (2)

Plaintiff told Kammerzell that she did not want to work those hours because she babysat in the

afternoon after work.  (*Id.*, Statement of Undisputed Material Facts ¶ 40; *admitted in relevant

part at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶ 40.)

Defendants contend Kammerzell told Plaintiff that she had two weeks to arrange her

schedule so that she could begin working until 5:00 P.M. on Mondays beginning on August 9,

2004.  (*Id.*, Statement of Undisputed Material Facts ¶ 42; *denied at* Pl.'s Resp., Objection to

Statement of Undisputed Facts ¶ 42.)  Plaintiff denies this allegation in her response brief, but the

portion of the Plaintiff's deposition that she relies upon to support this denial shows only that Plaintiff claims not to recall whether or not she was directed to change her hours beginning Monday, August 9, 2004. (Pl.'s Resp., Objection to Statement of Undisputed Facts ¶ 40; Defs.' Br., Ex. D at 62–63 [Pl. Dep.].) She states, rather cryptically, "I don't know if I was or not. But if he would have told me specifically that I had to, that I absolutely had to, I would have. But I don't remember." (Defs.' Br., Ex. D at 63 [Pl. Dep.].) In her affidavit, she states, "he was vague about whether I had to do it and never said why." (Pl.'s Resp., Ex. 2 ¶ 13 [Pl. Aff.].) Later in her response brief, Plaintiff impliedly admits that Kammerzell did in fact direct her to change her hours on Mondays when she states, "When [Kammerzell] asked Plaintiff whether she would change her work hours on Mondays, [he] told Plaintiff she had three weeks before she had to change her schedule." (*Id.*, Objection to Statement of Undisputed Facts ¶ 43.) Nonetheless, Plaintiff admits she did not work the hours as directed on Monday, August 9, 2004 or Monday, August 16, 2004. (Defs.' Br., Statement of Undisputed Material Facts ¶ 44; *admitted at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶ 44.)

The second corrective action, written by Kammerzell, states:

On July 26, I informed you that your work hours for Monday's [sic] would be [eight to five] and that would be effective August 9th, 2004. On August 9th you left at 3:00 PM; on August 16 you again failed to work the required hours and were absent from [three to five]. Effective August 18, 2004 your work hours will be 8 AM to 5 PM[, Monday through Friday]. You will have Lunch from 12:00 to 1:00 and you will have breaks from 10:00 [to] 10:15 and 3:00 [to] 3:15.

(*Id.*, Ex. W [Second Corrective Action].)

It is undisputed that as a supervisor, Kammerzell had the ability to set the work hours of his employees and that failure to report for work at an assigned time was grounds for a corrective action. (*Id.*, Statement of Undisputed Material Facts ¶¶ 39, 46; *admitted at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶¶ 39, 46.) Both corrective actions elucidated Plaintiff's grievance rights, including the date by which she had to make a grievance, the individual to whom she had to grieve, and the phone number to call for additional information regarding the grievance process. (*Id.*, Ex. V [First Corrective Action], Ex. W [Second Corrective Action].) The corrective actions did not alter Plaintiff's pay, status, or tenure, and were not placed in Plaintiff's personnel file. (*Id.*, Statement of Undisputed Material Facts ¶¶ 21, 23; *admitted at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶¶ 21, 23.)

On August 17, 2004, Plaintiff met with Valdez to discuss the second corrective action. (*Id.*, Statement of Undisputed Material Facts ¶ 50; *admitted at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶ 50.) At the meeting, Plaintiff relayed that she had informed Kammerzell the hours were unworkable for her because she babysat after work. (*Id.*, Ex. D at 68–69 [Pl. Dep.].) Valdez expressed that Kammerzell was very angry and had come stomping into her office the night before because Plaintiff failed to turn in her key, as requested. (*Id.*) That day, Plaintiff sent Kammerzell an email asking if she could give him the signed corrective action and her key the next day. (*Id.*, Ex. K [8/17/04 Email].)

### d.    *Plaintiff's Separation from the Business Office*

Plaintiff again met with Valdez on the morning of August 18, 2004. (*Id.*, Ex. D at 70 [Pl. Dep.].) She relates their discussion as follows. Valdez told Plaintiff that disobeying a direct order

-14-

from a superior was grounds for termination.  (*Id.*, Ex. D at 76 [Pl. Dep.].)  Further, Valdez said

Plaintiff "should consider resigning, because anything [she does] from here on out is only going to

hurt [her] further."  (*Id.*, Ex. D at 72–73 [Pl. Dep.].)  Valdez suggested that Plaintiff negotiate

with Kammerzell by offering to resign if he would destroy the corrective action so that it would

never be placed in her personnel file.  (*Id.*, Ex. D at 74 [Pl. Dep.].)  Valdez discussed inter-CSU

transfer options with Plaintiff and stated that transferring would be easier if she resigned and got

her second corrective action destroyed.  (Pl.'s Resp., Ex. 2 ¶ 21 [Pl. Aff.].)

On June 18, 2004 at 11:59 A.M., based upon Valdez's suggestion, Plaintiff drafted an

email in her own office and sent it to Kammerzell, proposing that she resign if he agreed to

destroy the second corrective action and ensure it never went into her personnel file.  (Defs.' Br.,

Ex. L [8/18/04 11:59 Email], Ex. D at 76–77 [Pl. Dep.].)  Further, Plaintiff requested that

Kammerzell: (1) not say anything negative to future potential employers who contact him; (2)

keep Plaintiff's departure confidential; and (3) allow Plaintiff to work through September 8, 2004.

(*Id.*, Ex. L [8/18/04 11:59 Email].)  At 2:06 P.M., Kammerzell replied to Plaintiff's email, agreed

to her requests, and asked for her letter of resignation before 4:00 P.M. that day.  (*Id.*, Ex. L

[8/18/04 2:06 Email].)  Plaintiff again met with Valdez later that afternoon, and Valdez suggested

that Plaintiff request Kammerzell give her more time to make her decision.  (*Id.*, Statement of

Undisputed Material Facts ¶ 53; *admitted at* Pl.'s Resp., Objection to Statement of Undisputed

Facts ¶ 53.)  At 3:46 P.M., Plaintiff sent another email to Kammerzell, explaining that she had just

received "a lot of information" from Valdez and requesting she be given until the close of business

on August 19 to "absorb all of this information" and decide upon her resignation.  (*Id.*, Ex. M

[8/18/04 3:46 Email].)  Kammerzell approved this request but stated that if she did not resign, he would start disciplinary proceedings against her.  (*Id.*, Ex. M [8/18/04 4:03 Email].)

On the morning of August 19, 2004, Plaintiff met with Smith for approximately two hours, during which Smith gave Plaintiff instructions for grieving the second corrective action. (*Id.*, Statement of Undisputed Material Facts ¶ 57; *admitted in relevant part at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶ 57.)  That same day, at approximately 12:30 P.M., Plaintiff sent an email to Valdez asking a series of questions, including whether the second corrective action would be removed if she worked the requested hours.  (*Id.*, Statement of Undisputed Material Facts ¶ 61; *admitted in relevant part at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶ 61.)  At 12:49 P.M., Plaintiff sent Kammerzell an email relaying, in part, the following:

> I have been thinking about a few things overnight, thought I'd share my thoughts. While I greatly appreciate your efforts in helping to negotiate a friendly separation of employment from [the Business Office], I would like to provide my input in your decision making process, if you wouldn't mind.
>
> I have come to realize that I am going to become unemployed either way. Therefore, I am asking if you would allow me the opportunity to find another job prior to submitting my resignation? . . . .
>
> As I had mentioned to you yesterday . . ., when I am fortunate enough to land a job I am actively pursuing, I would still be willing to at least do some of the priority folders I had done for so long, on my own time at home . . . .

(*Id.*, Ex. O [8/19/04 12:49 Email].)

Kammerzell responded at 1:05 P.M., stating: (1) "I will deal with the work load as necessary even if I need a temporary person;" and (2) "If you don't [resign] immediately, I will

file the corrective action this afternoon.  With or without your signature, I will contact [Human Resources] to begin disciplinary/termination action." (Pl.'s Resp., Ex. 18 [8/19/06 1:05 Email].) Further, he wrote: "I need an end to this as quickly as possible." (*Id.*)

At some point that day, Plaintiff found a letter of resignation on her desk.  (*Id.*, Ex. D at 87 [Pl. Dep.].)  At approximately 2:30 P.M., Plaintiff wrote Kammerzell another email asking if she could again meet with Valdez that afternoon, and he replied that she could.  (*Id.*, Statement of Undisputed Material Facts ¶ 65; *admitted at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶ 65.)  Plaintiff did so and again discussed opportunities to transfer to other jobs at CSU. (*Id.*, Statement of Undisputed Material Facts ¶ 66; *admitted at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶ 66.)  Plaintiff testified that Valdez told her she could be transferred, but did not tell Plaintiff she would be transferred.  (*Id.*, Ex. D at 89 [Pl. Dep.].) According to Plaintiff, she was "in tears" and told Valdez, "I don't know what to do, I feel like I don't have a choice.  And [Valdez] said, just go ahead and sign this letter, referring to the letter of resignation." (*Id.*, Ex. D at 87–88 [Pl. Dep.].)  Plaintiff then signed the letter, and Valdez immediately called Kammerzell into her office and informed him that Plaintiff had resigned.  (*Id.*, Ex. D at 88 [Pl. Dep.].)  Plaintiff contends that when she asked Kammerzell why he was taking this action against her, "[h]e became red faced and spat out what sounded like the letter 'b,' then just stopped and refused to answer.  He then yelled loudly 'I have the power!!'" (Pl.'s Resp., Ex. 2 ¶ 28 [Pl. Aff.].)

Plaintiff never received disciplinary action.  (*Id.*, Statement of Undisputed Material Facts ¶ 69; *admitted at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶ 69.)  Plaintiff's last day

working in the Business Office was August 20, 2004; although she remained on the payroll

through September 8, 2004.  (*Id.*, Statement of Undisputed Material Facts ¶ 68; *admitted at* Pl.'s

Resp., Objection to Statement of Undisputed Facts ¶ 68.)  That day, Plaintiff claims she saw

Valdez in the parking lot and said she wanted to rescind her resignation, but Valdez told her it

was too late.  (Pl.'s Resp., Ex. 2 ¶ 30 [Pl. Aff.].)  The employee who replaced Plaintiff was

female.  (*Id.*, Statement of Undisputed Material Facts ¶ 76; *admitted at* Pl.'s Resp., Objection to

Statement of Undisputed Facts ¶ 76.)

      Plaintiff states in her deposition that she had scheduled a due process meeting with Dr.

Powers the Monday after her termination, but that she presumed that meeting was cancelled when

she turned in her letter of resignation.[3]  (Defs.' Br., Ex. D at 92–93 [Pl. Dep.].)  To Plaintiff's

knowledge, no one in the Business Office cancelled this meeting.  (*Id.*)

---

[3]In contrast, Plaintiff stated in her affidavit that because Dr. Powers never returned her
email, she was unable to schedule this meeting at all.  (Pl.'s Resp., Ex. 2 ¶ 31 [Pl. Aff.].)

### e.      *Allegations Regarding Gender Discrimination*

Plaintiff first believed she was a victim of gender discrimination in September or October of 2003 and that the corrective actions were intended to harass her based on her gender.  (*Id.*, Statement of Undisputed Material Facts ¶ 81; *admitted at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶ 81; *id.*, Ex. D at 53–54, 89–90, 110–11 [Pl. Dep.].)  Specifically, Plaintiff says she became aware she was being discriminated against based on gender "[w]hen there was so much turmoil in the office and people were in tears and nothing was being done to correct the situation."  (*Id.*, Ex. D at 110 [Pl. Dep.].)  Plaintiff believes her co-workers' harassment was sex-based, because "a man would have probably fought back" and "women aren't as aggressive." (*Id.*, Ex. D at 30–31 [Pl. Dep.].)  Furthermore, she believes her allegedly forced resignation constituted gender discrimination, because: (1) "I think a man would have stood up for himself;" (2) "[m]aybe a man would have been more aggressive and even just assertive;" and (3) Kammerzell would not have been physically, emotionally, or psychologically abusive to a man. (*Id.*, Ex. D at 121–22 [Pl. Dep.].)

Plaintiff was aware that CSU had a policy prohibiting sexual harassment and understood that harassment complaints should be reported to the personnel department.  (*Id.*, Statement of Undisputed Material Facts ¶ 93; *admitted at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶ 93.)  Plaintiff did not consult CSU's harassment policy during her employment and did not take any action to look for CSU's policies regarding discrimination.  (*Id.*, Statement of Undisputed Material Facts ¶¶ 94–95; *admitted at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶¶ 94–95.)  During her talks with Valdez, Monzingo, Smith, and Kammerzell,

Plaintiff never explicitly complained of gender discrimination.  (*Id.*, Ex. D at 53, 90–91, 100 [Pl. Dep.].)  However, on one or two occasions, Plaintiff asked Valdez if Kammerzell "would have done this to a guy," referring to her two corrective actions.  (*Id.*, Ex. D at 54–55, 249 [Pl. Dep.].)

Following Plaintiff's resignation, she spoke on the phone and twice met with Roselyn Cutler, Associate Director in the CSU Office of Equal Opportunity.  (*Id.*, Statement of Undisputed Material Facts ¶¶ 101–02; *admitted at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶¶ 101–02; *id.*, Ex. D at 120 [Pl. Dep.].)  Cutler told Plaintiff she should rescind her resignation "right away," but Plaintiff took no actions to do so.  (*Id.*, Ex. D at 120–21 [Pl. Dep.].)  Though Cutler did not say so, Plaintiff believed she could not rescind her resignation. (*Id.*)  Further, Plaintiff claims she did not think she had to rescind her resignation because she did not feel that she had resigned.  (*Id.*)

According to Plaintiff, she raised the issue of discrimination with Cutler, who told her that the behavior Plaintiff described at work did not constitute discrimination or harassment.  (*Id.*, Ex. D at 106, 108 [Pl. Dep.].)  Cutler discussed Plaintiff's option to file a complaint and gave her the paperwork to do so; Cutler also gave Plaintiff CSU's sexual harassment policy.  (*Id.*, Statement of Undisputed Material Facts ¶¶ 103–04; *admitted at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶¶ 103–04.)  Cutler informed Plaintiff that she had missed the deadline for filing a claim of discrimination or harassment with CSU.  (*Id.*, Ex. D at 107 [Pl. Dep.].)

On June 2, 2005, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission claiming she had been discriminated against based on her sex.  (*Id.*, Ex. AA [Charge.])  The particulars of Plaintiff's charge are as follows:

Beginning in/around June 2004 and continuing, I was subject to harassment, when the Business Manager (male) yelled at me in front of my coworkers, pointed his finger in my face, and made me sit with my face to the corner in a poorly-ventilated office.  I felt intimidated by the Business Manager's harassment.  In/around June 2004, my vacation request was denied, I was not allowed to use or be paid for comp time, I was not allowed to do billing because no one would train me.  On/about June 28, 2004, I was written up.  On/about August 16, 2004, I became aware that my position had been posted.  On/about August 17, 2004, I was written up and instructed to turn in my keys.  On/about August 18, 2004, I was accused of making two of my coworkers quit and I was instructed to submit a letter of resignation.  On/about August 19, 2004, I sent an email stating that I would resign if my last corrective action was destroyed and removed from my file.  On/about August 20, 2004, I was told that I had resigned from my position as Administrative Assistant III.

(*Id.*)

Kammerzell is no longer supervising all Business Office employees, but now supervises the histology lab, which consists of three men and two women.  (Pl.'s Resp., Pl.'s Contested Facts ¶¶ 36–37; *admitted in relevant part at* Defs.' Reply, Resp. Concerning Disputed Facts ¶¶ 36–37.) Kammerzell states he uses the same supervisory techniques now but does not have interpersonal problems in the histology lab.  (*Id.*, Pl.'s Contested Facts ¶ 38; *admitted in relevant part at* Defs.' Reply, Resp. Concerning Disputed Facts ¶ 38.)  The histology lab employees are on a slightly higher and lower level than Plaintiff and equal to other female employees in the Business Office. (*Id.*, Pl.'s Contested Facts ¶ 41; *admitted at* Defs.' Reply, Resp. Concerning Disputed Facts ¶ 41.) The histology lab employees do not fight or engage in shouting matches.  (*Id.*, Pl.'s Contested Facts ¶¶ 40–41 *admitted at* Defs.' Reply, Resp. Concerning Disputed Facts ¶¶ 40–41.)

**2.**     ***Procedural History***

On December 6, 2005, Plaintiff filed a complaint with this court, and on March 13, 2006,

Plaintiff filed a first amended complaint.  (Title VII Compl. [filed Dec. 6, 2005]; Amended Compl.

and Jury Demand [filed Mar. 13, 2006].)  On March 17, 2006, Plaintiff filed a final and second

amended complaint alleging Defendants created a hostile work environment, discriminated against

her based on her gender, and retaliated against her for engaging in protected activity in violation

of Title VII and the Equal Protection Clause of the United States Constitution.  (Second Am.

Compl. and Jury Demand [filed Mar. 17, 2006] [hereinafter "Second Am. Compl."].)  Plaintiff

also alleged that Kammerzell, by terminating her without a hearing, deprived her of her right to

due process.[4]  (*Id.*)  On April 2, 2006, Defendants filed an answer to Plaintiff's second amended

complaint.  (Answer to Pl.'s Second Am. Compl. [filed April 2, 2005].)  On September 13, 2006,

Defendants filed a motion for summary judgment on all of Plaintiff's claims, arguing Plaintiff

failed to establish that she: (1) was subject to a sufficiently severe and pervasive hostile work

environment stemming from Plaintiff's gender; (2) was subject to any cognizable disparate

treatment; (3) suffered an adverse employment action; (4) engaged in protected activity that led

---

[4]Additionally, Plaintiff asserted claims pursuant to the First Amendment and the Colorado Anti-Discrimination Act.  (Second Am. Compl. ¶¶ 29–32, 39–43.)  Plaintiff does not deny having withdrawn her First Amendment claim.  (Defs.' Br. at 17 n.1; *see* Pl.'s Resp.)  Further, because she fails to raise any argument concerning either the First Amendment or the Colorado Anti-Discrimination Act in her response to Defendant's motion for summary judgment on all counts, Plaintiff is deemed to have waived these claims.  *See Asia Strategic Inv. Alliances, Ltd. v. Gen. Elec. Corp. Servs., Inc.*, Nos. 97–3236 & 97–3259, 1998 U.S. App. LEXIS 29970, at * 11 (10th Cir. Nov. 24, 1998) (finding that even if a party raises an issue in its complaint, failure to assert a legal reason why summary judgment should not be granted constitutes a waiver of that ground); *accord Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995) (citing *Vaughner v. Pulito*, 804 F.2d 873, 877 n.2 [5th Cir. 1986]).

Kammerzell to retaliate; and (5) exhausted her remedies. (Defs.' Br. at 17–48.) Defendants further argue that Plaintiff's due process claim fails because she was not deprived of a protected property interest. (*Id.* at 48–51.) On October 20, 2006, Plaintiff responded to the motion. (Pl.'s Resp.) On November 13, 2006, Defendants replied in support of their motion. (Defs.' Reply.) This issue is fully briefed and ripe for review.

## ANALYSIS

### 1.    Standard of Review

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2007); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e) (2007). A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury

to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.

1997) (citing *Anderson*, 477 U.S. at 248). The court may consider only admissible evidence when

ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d

1467, 1474 (10th Cir. 1985). The factual record and reasonable inferences therefrom are viewed

in the light most favorable to the party opposing summary judgment. *Byers*, 150 F.3d at 1274

(citing *Concrete Works*, 36 F.3d at 1517).

**2.      *Evaluation of Claims***

         Defendants argue they are entitled for summary judgment on all of Plaintiff's claims,

because Plaintiff cannot prove that she: (1) was subject to a hostile work environment because she

fails to show that that the complained-of behavior was sufficiently severe or pervasive, stemmed

from gender animus, and was created by anyone other than female co-workers; (2) endured any

cognizable disparate treatment because she was not subject to an adverse employment action and

the complained-of actions do not give rise to an inference of discrimination; (3) was

constructively discharged, rather than voluntarily resigned; (4) was retaliated against because she

fails to show that she engaged in protected activity prior to the alleged retaliation, that

Kammerzell was aware of her having engaged in protected activity, and that Kammerzell had

retaliatory intent; and (5) exhausted her remedies. (Defs.' Br. at 17–48.) Defendants further

argue that Plaintiff's due process claim fails because she did not suffer a deprivation of protected

property interest. (*Id.* at 48–51.) Plaintiff, in her short responsive argument, urges, with minimal

reference to supporting caselaw, that she has indeed met her burden of proof. (*See* Pl.'s Resp. at

21–32.)  I find Plaintiff has fallen woefully short of creating a genuine issue of any material fact

and address only those arguments necessary to dispose of her arguably frivolous claims.

### a.   Title VII Primer

When, as here, a plaintiff cannot present direct evidence of discrimination, this circuit

applies the framework of shifting evidentiary burdens outlined by the Supreme Court in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), in analyzing discrimination claims

brought pursuant to Title VII.  *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004).

As a threshold matter under *McDonnell Douglas*, Plaintiff must establish a *prima facie* case of

discrimination.  *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 922 (10th Cir. 2001).  The

burden of establishing a *prima facie* case is "not onerous."  *Id.*  (citation and internal quotation

marks omitted).  "Establishment of a *prima facie* case creates a presumption of unlawful

discrimination."  *Tex. Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981).  If Plaintiff

establishes a *prima facie* case, the burden of production then shifts to Defendants to "articulate a

legitimate, nondiscriminatory reason" for their adverse actions.  *Wells v. Colo. Dep't of Transp.*,

325 F.3d 1205, 1212 (10th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 792).  If

Defendants articulate a proper basis for their actions, the burden shifts back to Plaintiff to

demonstrate that the reason advanced by Defendants is a pretext for discrimination.  *Burdine*, 450

U.S. at 255–56.

### b.   Sexual Harassment

Title VII prohibits subjecting an employee to sexual harassment.  *Meritor Sav. Bank, FSB*

*v. Vinson*, 477 U.S. 57, 65–66 (1986).  "Courts have consistently recognized two distinct

categories of sexual harassment claims: *quid pro quo* sexual harassment, and hostile work environment sexual harassment." *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1413 (10th Cir. 1987); *accord Meritor*, 477 U.S. at 65–66.  In the instant case, Plaintiff brings claims under only the hostile work environment category, alleging Defendants discriminated against her by maintaining a hostile work environment in violation of Title VII.  (Second Am. Compl. ¶¶ 29–32.) She also brings a hostile work environment claim against Kammerzell, in both his official and individual capacity, pursuant to 42 U.S.C. § 1983 (2006) ("section 1983").  (*Id.* ¶¶ 32–38.) Defendants move for summary judgment on all counts.  (*See* Defs.' Br.)  I address the Title VII claim first.

> **i.**     ***Title VII Hostile Work Environment***

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to [] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1) (2006).  This statutory provision prohibits subjecting an employee to a hostile work environment.  *Meritor*, 477 U.S. at 65–66.  The Tenth Circuit has held:

> Title VII's prohibition of employment discrimination based on sex encompasses hostile work environment sexual harassment.  This harassment occurs where [sexual] conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.  To form the basis of a claim, the sexual harassment must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment.  Based on the totality of the circumstances, the environment must be perceived both subjectively and objectively as abusive.

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) (citations and internal quotation marks omitted) (alterations in original). Moreover, the Tenth Circuit has held that "[s]exual harassment is behavior 'that would not occur but for the sex of the employee' . . . . 'If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination.'" *Winsor v. Hinckley Dodge*, 79 F.3d 996, 1000 (10th Cir. 1996) (quoting *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1537 [10th Cir. 1995]) (citations and internal quotation marks omitted).

To establish that a hostile work environment existed, Plaintiff must prove the following elements: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) due to its severity or pervasiveness, the harassment altered a term, condition, or privilege of Plaintiff's employment and created an abusive working environment. *Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 797 (10th Cir. 1997). With these general principles in mind, I evaluate Plaintiff's hostile work environment claim first with respect to Plaintiff's co-workers and second with respect to Kammerzell.

### *(1)   Harassment by Co-workers*

Plaintiff seeks to hold Defendants liable for harassment by her co-workers.[5]  (Pl.'s Resp. at

22–23.)  Plaintiff is a woman, satisfying the first element.  As to the second element, Plaintiff

asserts she was subjected to unwelcome harassment when her co-workers: (1) talked about,

pointed at, and laughed at her behind her back; (2) complained about her to supervisors without

any basis for doing so; (3) refused to talk to her or let her engage in their conversations; (4)

assigned her more difficult work; (5) told her she should dress nicer; (6) threw pens and

paperclips at her; (7) flicked their hands in her face; (8) called her a "bitch," "asshole," "slut,"

"f'ing loser," and said she's "not worth it;" (9) explosively yelled at Plaintiff, accusing her of acts

of which she was innocent; (10) bumped Plaintiff's chair; (11) "snapped" Plaintiff's neck; (12)

elbowed Plaintiff in the head; (13) accused her of bringing in soup that was not homemade, when

the soup was in fact homemade; and (14) tossed a rubber penis around the room, but never tossed

it to Plaintiff.  (Pl.'s Resp. at 1–20.)

The Supreme Court has recognized the viability of same-sex harassment claims under Title

VII.  *Oncale v. Sundowner Offshores Servs.*, 523 U.S. 75, 80–81 (1998).  The *Onacle* court laid

out three evidentiary routes for establishing same-sex sexual harassment: (1) "explicit or implicit

proposals for sexual activity" when there is credible evidence that the harassment is motivated by

---

[5]The parties dispute whether Defendants can be held liable for co-worker harassment. (Defs.' Br. at 34; Pl.'s Resp. at 22–23.)  The law in this circuit is clearly established that an employer can be held vicariously liable for harassment by co-workers based on a negligence theory.  *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1074 (10th Cir. 1998).  Because I find that Plaintiff has failed to plead sufficient facts to show she was the subject of sex-based harassment, I need not reach the issue of Defendants' negligence.

sexual desire; (2) when, for instance, a "female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by gender hostility to the presence of women in the workplace;" and (3) when the plaintiff offers proof that the harasser treats men and women differently in the workplace.  523 U.S. at 80; *accord Dick v. Phone Directories Co.*, 397 F.3d 1256, 1263–64 (10th Cir. 2005).  These evidentiary routes are exemplary rather than exclusive.  *James v. Platte River Steel Co.*, 113 F. App'x 864, 867 (10th Cir. 2004).  "The Third and Ninth Circuits, for example, have held that a plaintiff may be able to establish actionable same-sex sexual harassment by showing that the harasser's conduct was motivated by a belief that the plaintiff did not conform to the stereotypes of his or her gender." *Id.* (citing *Bibby v. Philadelphia Coca Cola Bottling Co.*, 260 F.3d 257, 262–63 [3d Cir. 2001]; *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 874–75 [9th Cir. 2001]).  Plaintiff's brief seems to suggest that her averments can support a finding of animus toward women and/or actionable sex-stereotyping.[6]  (*See* Pl.'s Resp. at 21–22.)  I consider both bases for the claim.

---

[6]Plaintiff offers no evidence that her harassers were homosexual or motivated in any way by sexual desire.  (*See* Pl.'s Resp. at 21–22.)  Moreover, she admits to having no male comparators in the Business Office.  (Pl.'s Resp. at 22.)  Nonetheless, Plaintiff states that the harassers treated men in the department differently than women.  (*Id.* at 21.)  Because this assertion is not supported by a single allegation in Plaintiff's response brief, much less a citation to the record, I do not consider it.  Such "conclusory and self-serving [declarations] are not sufficient" to provide any factual basis for granting or denying a motion for summary judgment. *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991).

### (a)     Animus

Plaintiff contends she has shown that her co-workers directed "animus" toward her "for her inability to be a girlfriend." (Pl.'s Resp. at 22.)  The problem for Plaintiff is that her allegations include almost no sex-specific actions taken or terms used by her co-workers.  (*Id.* at 1–20.)  Although tossing a rubber penis around may be in poor taste, this court has no basis for concluding that Plaintiff's co-workers engaged in the "game" "because of" Plaintiff's sex.  *Onacle*, 523 U.S. at 79.  Similarly, throwing things at Plaintiff, refusing to talk to her, accusing her of trying to pass off Campbell's soup as her own, and the like are plainly childish and cruel, but simply do not make "clear that the harasser[s] [were] motivated by gender hostility to the presence of women in the workplace."  *Id.* at 80.  The only arguably "sex-specific," "derogatory" terms used by Plaintiff's co-workers were "bitch" and "slut."  However, the "sporadic use of abusive language" is simply insufficient to obtain relief under Title VII.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  Plaintiff has wholly failed to aver sufficient facts to support a finding that her co-workers' harassment was motivated by animus towards females.  *See Baugham v. Battered Women, Inc.*, 211 F. App'x 432, 439 (6th Cir. 2006) (finding plaintiffs had failed to show harassment was sex-based because most of their allegations were devoid of sex-specific terms and had "absolutely nothing to do with the fact that [p]laintiffs [were] females").

### (b)     Sex Stereotyping

Next, Plaintiff asserts that her co-workers' harassment was motivated by a belief that Plaintiff did not conform to the stereotypes of her gender.  (Pl.'s Resp. at 21–22.)  This circuit has not yet had the opportunity to consider whether a plaintiff may utilize sex-stereotyping as an

-30-

evidentiary route to prove a same-sex harassment; however, it has explicitly recognized that other

circuits have done so.  *See James*, 113 F. App'x at 867.  I see no reason to believe the Tenth

Circuit would not do the same if the question fell squarely before it.  The Supreme Court, in *Price*

*Waterhouse v. Hopkins*, 490 U.S. 228 (1989), made clear that Title VII does not permit an

employer to treat an employee adversely simply because her conduct or appearance does not

conform to gender stereotypes.  The Court found that, in choosing to deny the plaintiff

partnership, the defendant had engaged in sex-based discrimination by relying on partners'

statements stemming from "an impermissibly cabined view of the proper behavior of women."

490 U.S. at 236–37.  Specifically, partners were noted to have said the plaintiff was "macho,"

"overcompensated for being a woman," should take a "course in charm school," and was "a lady

using foul language."  *Id.* at 235.  One supporter of the plaintiff's bid for partnership explained

that the plaintiff "ha[d] matured from a tough-talking somewhat masculine hard-nosed [manager]

to an authoritative, formidable, but much more appealing lady [partnership] candidate."  *Id.*

When the plaintiff was informed of the reasons her candidacy had been put on hold, she was

advised to "walk more femininely, talk more femininely, dress more femininely, wear make-up,

have her hair styled, and wear jewelry."  *Id.*  The Court, in upholding summary judgment for the

plaintiff found:

> As for the legal relevance of sex stereotyping, we are beyond the day when an
> employer could evaluate employees by assuming or insisting that they matched the
> stereotype associated with their group, for in forbidding employers to discriminate
> against individuals because of their sex, Congress intended to strike at the entire
> spectrum of disparate treatment of men and women resulting from sex stereotypes.

*Id.* at 251.

Based on *Price Waterhouse*, those circuits that have considered the issue have concluded

that a plaintiff may prove that same-sex harassment by co-workers was sex-based by showing the

harassment stemmed from his or her failure to conform to gender stereotypes.  *See, e.g.*, *Nichols*,

256 F.3d at 874–75 (holding that co-workers and one supervisor illegally harassed a man because

of his sex based on evidence that the co-workers told the plaintiff he walked and carried his tray

"like a woman," deriding him for not having sexual intercourse with a co-worker who was his

friend, referring to him as a "she" or "her," and calling him vulgar names cast in female terms);

*Doe by Doe v. City of Belleville*, 119 F.3d 563, 580–83 (7th Cir. 1997) (holding that where co-

workers verbally and physically harassed a young man because he wore an earring, repeatedly

asked him whether he was a girl or a boy, and threatened to assault him sexually, the plaintiff had

presented sufficient evidence to support a conclusion that the harassment amounted to

discrimination because of sex).[7]  I find these decisions persuasive.  In fact, in this court's opinion,

*Price Waterhouse* and *Onacle*, read together, leave this court no choice but to recognize that

same-sex harassment may be proven sex-based by showing that the harassment was motivated by

the plaintiff's failure to conform to gender stereotypes.

Plaintiff fancies herself similar to the plaintiff in *Price Waterhouse*, arguing she was

harassed because she "did not walk and dress femininely, did not wear jewelry and makeup and

---

[7]This decision was vacated and remanded by the Supreme Court for further consideration
in light of *Onacle*, but a settlement rendered reconsideration unnecessary.  523 U.S. 1101 (1998).
Nonetheless, districts in the Seventh Circuit continue to treat the holding as binding upon them.
*See, e.g.*, *Jones v. Pac. Rail Servs.*, 2001 U.S. Dist. LEXIS 1549, No. 00 C 5776, at *6–7 (N.D.
Ill. Feb. 14, 2001).

was aggressive in her personality." (Pl.'s Resp. at 21–22.) The problem for Plaintiff, again, is that simply saying something does not make it so. In fact, Plaintiff does not even allege that her co-workers told her to walk or dress femininely, wear jewelry and makeup, or be less aggressive. (*See id.* at 1–21.) Plaintiff's only even arguably supportive allegation is that her co-workers told her she should "dress nicer." (*Id.*, Ex. 2 ¶ 2 [Pl. Aff.].) Plaintiff, apparently, wore sweatshirts, baggy pants, and workboots to work, while her co-workers "dressed up much of the time." (*Id.*, Ex. 2 ¶¶ 1–3 [Pl. Aff.].) Plaintiff does not allege her co-workers told her to wear skirts and dresses or other stereotypically feminine attire. (*See id.*) There is nothing in her co-workers' statement that suggests they would not have been satisfied by Plaintiff wearing "dressier," but not necessarily more feminine clothing. Thus, I find the facts of *Price Waterhouse* are not analogous.

Similarly, that one of Plaintiff's co-workers grunted at Plaintiff like a pig and said she smelled of dog poop does not imply harassment based on Plaintiff's failure to comply with a gender stereotypes. Reading the facts in the light most favorable to Plaintiff, the court finds that she is indeed "clean" and has "good hygiene." (*Id.*, Ex. 2 ¶ 2 [Pl. Aff.].) Nonetheless, as Plaintiff points out, she was a casually dressed "farm woman;" whereas her co-workers were fashionable and seemingly disinterested in farm life. (*Id.*, Ex. 2 ¶¶ 1–3 [Pl. Aff.].) Without much more, Plaintiff's co-workers' comments give the court absolutely no reason to infer that they was gender-related, rather than related to the fact that Plaintiff was more interested in farm-life than fashion-life.

Plaintiff's allegations of childish and often cruel behavior by her co-workers, though shocking, simply do not raise a plausible inference of gender stereotyping. That Plaintiff was the

recipient of physical abuse is unfortunate but irrelevant to whether discrimination occurred, without some statements or actions showing that the abuse was gender-related. *Dick*, 397 F.3d at 1263 (quoting *Stahl v. Sun Microsys., Inc.*, 19 F.3d 533, 538 [10th Cir. 1994]) ("'If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment.'"); *Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) ("General harassment if not racial or sexual is not actionable.").

Similarly, Plaintiff makes no showing that the fact that she was disliked, talked about, and considered a liar, as well as an incapable cook, has anything to do with her non-conformity to gender stereotypes. Rather, much of the complained-of behavior was visited upon many other co-workers who apparently *did* conform to such stereotypes. Plaintiff stated her co-workers: (1) did not like each other; (2) grunted at each other; (3) threw pens and paper clips at one another; (4) were "irritated" by the presence of women; and (5) talked about other co-workers behind their backs, "stabbing them in the back, cutting them down about their kids, their husbands, their life, that they're stupid." (Defs.' Br., Ex. D at 27–28 [Pl.'s Dep.]; Pl's Resp., at 22 ["The females in (the Business Office) were motivated by dislike for each other as well as for Plaintiff, as they were irritated by the presence of menopausal and irritable women and just the presence of women in small confines."].) These allegations make it impossible for this court to conclude that the same mistreatment, when directed at Plaintiff, was somehow uniquely motivated by her lack of conformity to gender norms. *See Bolden*, 43 F.3d at 551–52 (finding evidence that other co-workers were subjected to much of the ridicule, intimidation, and insults to which the plaintiff was subjected supports a finding that plaintiff was not targeted due to his race). Moreover, Plaintiff

herself conjectured that her co-workers began disliking her and mistreating her out of jealousy after her work was publicly complimented by her superiors.  (*See* Defs.' Br., Ex. D at 4–5, 25–27, 103–04.)  Finally, Plaintiff's contentions that "a man would have probably fought back" and "women aren't as aggressive" do nothing to show her harassers targeted Plaintiff based on her sex, but may suggest that Plaintiff harbors some gender stereotypes of her own.  (*See id.*, Ex. D at 121–22 [Pl. Dep.].)  Based on the foregoing, I find Plaintiff's allegations fall painfully short of establishing a genuine issue of material fact as to whether the harassment she received from co-workers was sex-based.

### (2)    *Harassment by Kammerzell*

Plaintiff also claims Kammerzell harassed her in a manner sufficient to establish a hostile work environment.  (Second Am. Compl. ¶¶ 29–38.)  Defendants contend these claims must fail because Plaintiff has failed to show that: (1) Kammerzell's alleged harassment stemmed from gender animus; (2) the harassment was sufficiently severe or pervasive to create a hostile work environment; and (3) Plaintiff exhausted her remedies with respect to Kammerzell's alleged harassment.  (*Id.* at 18–26.)  I need only address Defendants' first argument.

Strangely, Plaintiff does not even articulate a theory by which Kammerzell's alleged harassment could be construed as discriminatory.[8]  (*See* Pl.'s Resp. at 21–23.)  Nonetheless, Plaintiff's allegations, liberally construed, arguably suggest Plaintiff intends to show Kammerzell

---

[8]Plaintiff does argue Kammerzell subjected her to disparate treatment, but fails to argue such disparate treatment constituted a hostile work environment.  (*See* Pl.'s Resp. at 23.)  Instead, she focuses her disparate treatment claim around Plaintiff's alleged constructive discharge.  (*Id.*)  I address this claim below.  (*See Analysis* § 2[d], *infra.*)

harbors animus toward women. (*See id.* at 1–21.) Therefore, I consider whether Kammerzell's behavior, viewed in the light most favorable to Plaintiff, evinces animus toward women.

Only overtly sexual harassment may be presumed to be because of the victim's gender. *See Oncale*, 523 U.S. at 81. A plaintiff, however, may meet her *prima facie* burden of proving that harassment was sex-based by showing the harasser had a general hostility toward women. *See Risk v. King Soopers*, 366 F.3d 1085, 1092 (10th Cir. 2004). Because Plaintiff fails to address the basis for her harassment claim against Kammerzell, the court is left to determine for itself what allegations could conceivably support such a claim. (*See* Pl.'s Resp.) Although Plaintiff alleges Kammerzell (1) yelled at her on two occasions, (2) swung his fist near her face, (3) did not give credence to her workplace complaints, and (4) gave her two undeserved corrective actions, none of these allegations clearly relate to Plaintiff's sex. (*See* Pl.'s Resp. *passim.*) This court has absolutely no reason to infer that these actions stemmed from Kammerzell's dislike of women, rather than from his dislike of Plaintiff. Although "[f]acially neutral abusive conduct can support a finding of gender animus sufficient to sustain a hostile work environment claim," it may only do so "when that conduct is viewed in the context of other, overtly gender-discriminatory conduct." *O'Shea v. Yellow Tech Servs.*, 185 F.3d 1093, 1097 (10th Cir. 1999). As discussed below, I find insufficient overtly gender-discriminatory conduct exists to find animus.

Plaintiff's averments that Kammerzell "spent much of his time in his office with a glazed look in his eyes, completely bored" due to his disinterest in the management of females is the kind of speculative, self-serving, conclusory allegation that only adds to the frivolous nature of

Plaintiff's claims.  (Pl.'s Resp., Ex. 2 ¶ 7 [Pl. Aff.])  In fact, Plaintiff has come forward with only

two isolated comments by Kammerzell regarding sex that could even arguably be construed as

"overtly gender-discriminatory:" (1) that the interpersonal issues in the office were a "woman

thing;" and (2) that "[t]hese women [in the Business Office] are driving me crazy."  (*Id.*, Pl.'s

Contested Facts ¶¶ 2, 20; *denied at* Defs.' Reply, Resp. to Disputed Facts ¶¶ 2, 20.)  This court

finds that such isolated comments, neither of which were directed at Plaintiff, are insufficient,

standing alone, to support an inference of animus toward women or to morph seemingly gender-

neutral, albeit abusive, behavior into discriminatory conduct.  *Sprenger v. S. Fed. Home Loan

Bank*, 253 F.3d 1106, 1113 (8th Cir. 2001) (internal citations and quotations omitted) (noting

that, "as in all areas of discrimination law, we hesitate to rely on isolated comments as proof of

bias, lest the law become a general civility code"); *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d

799, 806 n.7 (7th Cir. 1999) (endorsing district court's conclusion that racially insensitive, "stray

remarks . . . do not in themselves establish discriminatory animus"); *see Faragher*, 524 U.S. at

788 (finding "complaints attacking the ordinary tribulations of the workplace, such as sporadic

use of abusive language, gender-related jokes, and occasional teasing" do not fall within the

purview of Title VII).

 *Borden* is instructive on this point.  In *Borden*, two co-workers directed a few isolated,

overtly racist comments at the plaintiff.  43 F.3d at 549.  Additionally, the plaintiff was subject to

a barrage of harassment including being called names such as "dickhead" and "dumbshit," having

his chair rigged to fall when he leaned back, being violently pushed when the plaintiff accidently

bumped into a co-worker, and being the direct and intentional recipient of a co-worker's flatus.

*Id.* The court, noting that a "plaintiff must show more than a few isolated incidents of racial enmity," concluded there was insufficient evidence that the general ridicule and abuse plaintiff received was racially-motivated. *Id.* at 551–52 (internal quotations omitted). Based on the foregoing, I hold that no reasonable juror could find that Kammerzell's alleged harassment was because of her sex.

### ii. *Section 1983 Hostile Work Environment*

Plaintiff also brings a sexual harassment claim pursuant to section 1983 against Kammerzell in both his official and individual capacity. (Second Am. Compl. ¶¶ 33–38.) Section 1983 provides a remedy for constitutional violations committed by state or private actors under color of state law. *See* 42 U.S.C. § 1983 (2006). As an initial matter, Defendants note that the Eleventh Amendment to the United States Constitution bars section 1983 suits against individuals in their official capacities. (Defs.' Br. at 44 n.7.) Plaintiff does not contest this fact. (*See* Pl.'s Resp.) It is well settled that, save for a few exceptions inapplicable to the case at bar, suits against the State for money damages are barred by the Eleventh Amendment. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989); *AN Pipeline Co. v. Lafaver*, 150 F.3d 1178, 1187 (10th Cir. 1998). Moreover, a suit against a state official in his official capacity "is no different from a suit against the State itself." *Will*, 491 U.S. at 71. Thus, I grant summary judgment in favor of Defendants on all section 1983 claims against Kammerzell in his official capacity.

Defendants do not address, and therefore necessarily do not dispute, that Defendants are state actors and the Constitution protects the rights allegedly violated in this case. (*See* Defs.' Br.; Defs.' Reply.) Sex-based discrimination, as a violation of the Equal Protection Clause of the

-38-

United States Constitution, can be actionable under section 1983.  *Woodward v. City of Worland*, 977 F.2d 1392, 1397 (10th Cir. 1992).  Defendants urge that "the elements of a plaintiff's gender discrimination claims are the same under both Title VII and [s]ection 1983."  (Defs.' Br. at 17.)  Plaintiff does not contest this point, but the court is inclined to point out the Tenth Circuit's recent notation that what constitutes a hostile work environment in the context of section 1983 is not clearly established in this circuit.  *Mitchell v. City & County of Denver*, 112 F. App'x 662, 671 (10th Cir. 2004).  Nonetheless, my review of the relevant caselaw reveals that those circuits that have considered the issue have concluded that "[w]hen section 1983 is used as a parallel remedy for violation of . . . Title VII, the elements of the two causes of action are the same," except that a section 1983 claim may be brought against individuals.  *Stuart v. Jefferson County Dep't of Human Res.*, 152 F. App'x 798, 803 (11th Cir. 2005) (internal quotations omitted); *accord Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006); *Wright v. Rolette County*, 417 F.3d 879, 884–85 (8th Cir. 2005); *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 896 (1st Cir. 1988).  Although the court finds these cases persuasive, it need not decide the appropriate standard in the instant case; for, it is beyond dispute that to survive summary judgment on a plaintiff's claim that her rights under the Equal Protection Clause were violated by sexual harassment, she must, at the very least, show that the harassment was sex-based.  *See Craig v. Boren*, 429 U.S. 190 (1976) (noting the Equal Protection Clause of the Fourteenth Amendment protects women from discrimination *based on sex* by persons acting under color of state law).  Accordingly, my conclusion that Plaintiff has failed to show the harassment she experienced was sex-based renders her section 1983 hostile

-39-

workplace claim unviable.  (*See Analysis* § 2[b][i], *supra*.)  I grant Defendants summary judgment on Plaintiff's hostile workplace claim under both Title VII and section 1983.

   **c.     Constructive Discharge**

   Plaintiff brings a constructive discharge claim under both Title VII and section 1983.  (*See Compl.* ¶¶ 29–38.)  "An employee who is not formally discharged from employment may still be constructively discharged if the employee was forced to quit due to [sex]-based intolerable working conditions."  *Borden*, 43 F.3d at 552.  Such a discharge may violate both Title VII and section 1983.  *Id.* (Title VII); *Bailey v. Kirk*, 777 F.2d 567, 579 (10th Cir. 1985) (section 1983). Even assuming Plaintiff was forced to resign because of intolerable working conditions, this court's analysis of Plaintiff's hostile work environment claim establishes that she has failed to raise an inference that the conduct of her co-workers and Kammerzell — which created the allegedly intolerable working conditions — was based on her sex.  (*See Analysis* §2[b], *supra*.)  Although it is clear Plaintiff felt isolated and mistreated while working at the Business Office, "not every unhappy employee has an actionable claim of constructive discharge . . . .  [Plaintiff] has failed to show how [her] resignation was the result of illegal discriminatory conduct."  *Id.*  Therefore, I grant Defendants' summary judgment on Plaintiff's constructive discharge claim.

   **d.     Disparate Treatment**

   Defendants, although understandably confused about the basis for the claim, argue Plaintiff cannot prove she was subject to disparate treatment by Kammerzell.  (Defs.' Br. at 29–30.)  Plaintiff's second amended complaint and response brief suggest her disparate treatment claim is based on the alleged hostile work environment, corrective actions, and Plaintiff's

constructive discharge.  (*See* Second Am. Compl. ¶¶ 33–38; Pl.'s Resp. at 23.)  It appears that Plaintiff brings her disparate treatment claim only under  section 1983.  (*See* Second Am. Compl. ¶¶ 33–38.)

To establish a *prima facie* case of disparate treatment under section 1983, Plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) similarly situated employees were treated differently.  *Trujillo v. Univ. of Colo. Health Scis. Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998).  Because this inquiry may be fully satisfied at the third stage, I will assume *arguendo*, that Plaintiff satisfies the first two prongs, although the court has serious doubts that the corrective actions constitute an adverse employment action.  *See Orr v. City of Albuquerque*, 417 F.3d 1144, 1150 (10th Cir. 2005) (defining an "adverse employment action" as a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits).

Plaintiff may meet the third prong by demonstrating that Defendants treated similarly situated male employees differently.  *Jones v. Denver Post Corp.*, 203 F.3d 748. 753 (10th Cir. 2000).  "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."  *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) (citation and internal quotation marks omitted).  Although Plaintiff admits there are no direct male comparators, she also contends that disparate treatment can be proven by comparing Kammerzell's treatment of his Business Office employees

with his treatment of his histology lab employees.  (Pl.'s Resp. at 22–23.)  Plaintiff's disparate

treatment claim fails on three fronts.

First, I find Plaintiff has failed to plead *any* facts that would allow the court to conclude

that the histology lab employees are subject to the "same standards governing performance

evaluation and discipline."  *Aramburu*, 112 F.3d at 1404.  In evaluating whether employees are

similarly situated, this court is to "compare the relevant employment circumstances, such as work

history and company policies, applicable to the plaintiff and intended comparable employees."  *Id.*

Plaintiff has not provided the court with one scintilla of evidence about the work histories of or

CSU policies relevant to her supposed similarly situated employees.  (*See* Pl.'s Resp.)  For this

reason alone, she has failed to meet her *prima facie* burden.

Second, even assuming that the men in the histology lab are similarly situated individuals

to Plaintiff, I find that Plaintiff's allegations do not even conceivably support a finding that

Kammerzell treated men differently than women.  (*See* Pl.'s Resp. at 23.)  Plaintiff's argument,

which does not include a single case or record citation, follows *in toto*:

> In this case, men in similar circumstance, the men Kammerzell supervises in the
> histo[logy] lab, have a different Kammerzell management.  They have no history of
> violence and hostility and work problems out with Kammerzell's help.
> Kammerzell does not give the same level of quality in his supervision of the
> females in the Business [O]ffice and results were [sic] illegal discrimination
> because Kammerzell does not afford women the same working conditions as men.

(*Id.* at 23.)  The undisputed facts simply do not support Plaintiff's contention.  First, the histology

lab under Kammerzell's supervision consists of three men and *two women*.  (*Id.*, Pl.'s Contested

Facts ¶ 37; *admitted at* Defs.' Reply, Resp. Concerning Disputed Facts ¶ 37.)  All of Plaintiffs's

allegations concerning the histology lab — its lack of violence, hostility, and workplace conflict — are derived from Kammerzell's deposition, and are regarding the histology lab as a whole, meaning the treatment and behavior of both the men *and* women in the lab. (*See id.*, Pl.'s Contested Facts ¶¶ 38–44; *id.*, Ex. 6 at 87–88, 91–92 [Kammerzell Dep.].) Thus, although the evidence may conceivably be contorted to support a finding that Kammerzell treated his histology lab male *and* female employees differently than his female employees in the Business Office, this provides no support for Plaintiff's disparate treatment claim. *Cf. Brown v. Henderson*, 257 F.3d 246, 254 (2d Cir. 2001) (noting "the fact that both male and female employees are treated similarly, if badly, does give rise to the inference that their mistreatment shared a common cause that was unrelated to their sex").

Finally, even assuming Plaintiff had established the males in the histology lab as viable comparators, Plaintiff has failed to allege any facts showing that Kammerzell actually treated those men differently. (*See* Pl.'s Resp.) Her allegations center around the fact that the histology lab employees do not fight with, shout at, or cry and complain about one another. (*See id.*, Pl.'s Contested Facts ¶¶ 38–44.) These allegations establish — at most — that the employees of the histology lab, both male and female, do not act in the same childish fashion as those in the Business Office. Thus, without reservation, I grant Defendants summary judgment on Plaintiff's section 1983 disparate treatment claim.

###### e.    *Retaliation*

Plaintiff contends that Kammerzell gave her two corrective actions and constructively discharged her in retaliation for complaining of his discriminatory treatment. (*Id.* at 24.) Plaintiff

brings this claim pursuant to section 1983.  (Second. Am. Compl. ¶¶ 33–38.)  Defendants contend

Plaintiff pleads insufficient facts to sustain her retaliation claim.  (Defs.' Br. at 44–46.)  I note at

the outset that Plaintiff's failure to prove discrimination based on sex does not preclude her from

making a successful retaliation claim.  *Love v. RE/Max of Am., Inc.*, 738 F.2d 383, 385 (10th Cir.

1984).  Opposition activity is protected even when it is based on a good faith, though mistaken,

belief that the complainant suffered illegal discrimination.  *Id.*  To prove retaliation for the

exercise of constitutionally protected rights under section 1983, Plaintiff has the burden of

showing that: (1) she engaged in constitutionally protected activity; (2) Defendants' actions

would "chill a person of ordinary firmness from engaging in that activity in the future;" and (3) a

substantial motivating factor for Defendants' actions was retaliation for Plaintiff having engaged

in protected activity.  *Mallard v. Tomlinson*, 206 F. App'x 732, 737 (10th Cir. 2006).

Because this matter can be definitively concluded at the third element, I will assume without

deciding that: (1) Plaintiff's questioning of Valdez regarding whether Kammerzell "would have

done this to a guy" satisfies the first element; and (2) the two corrective actions as well Plaintiff's

alleged constructive discharge satisfy the second element.[9]

     As to the third element, to support a finding of retaliatory intent, Plaintiff must make a

*prima facie* showing — at minimum — that Kammerzell *knew* of her allegedly protected activity.

*Peterson v. Utah Dept. of Corrs.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (holding "an employer

---

[9]The court feels inclined to note its serious doubts as to whether Plaintiff's two comments
were sufficient to put Valdez on notice that Plaintiff was complaining of gender discrimination.
Further, as discussed below, Plaintiff has put forth insufficient evidence to show that her
resignation was forced, rather than voluntary.  (*See Analysis* § 2[f][i], *supra.*)

cannot engage in unlawful retaliation if it does not know that the employee has opposed or is

opposing" illegal discrimination).  Plaintiff alleges that she raised the specter of disparate

treatment with Valdez, not Kammerzell.  (Defs.' Br., Ex. D at 53–55, 90–91, 100, 249 [Pl.

Dep.].)  Thus, this court is left to determine whether there exists a genuine issue of material fact

as to whether Valdez told Kammerzell about Plaintiff's alleged complaints of gender

discrimination.  Putting aside the fact that Valdez stated in her affidavit that Plaintiff did not

complain to her of gender discrimination, Valdez testified at her deposition that she spoke with

Kammerzell only in generalities about Plaintiff's issues and "never told [] Kammerzell that

[Plaintiff] made any complaints of discrimination or harassment."  (*Id.*, Ex. Y ¶¶ 3, 6 [Valdez

Aff.], Ex. I at 6 [Valdez Dep.].)  Based on Valdez's sworn statements at her deposition and in her

affidavit, Defendants assert in their motion for summary judgment: "Ms. Valdez informed Mr.

Kammerzell that she had a meeting with Plaintiff, but she told Mr. Kammerzell only about the

'global issues' she discussed with Plaintiff; she did not tell Mr. Kammerzell that Plaintiff

complained of discrimination or harassment."  (Defs.' Br., Statement of Undisputed Material

Facts ¶ 99.)  Plaintiff denies this allegation, but fails to cite to supportive evidence.  (Pl.'s Resp.,

Objection to Statement of Undisputed Facts ¶ 99.)

        This court recognizes that "proof of an official's retaliatory intent rarely will be supported

by direct evidence of such intent."  *Poole v. County of Otero*, 271 F.3d 955, 962 (10th Cir. 2001).

Nonetheless, Plaintiff has failed to point the court to *any* evidence — direct or indirect — of

Kammerzell's knowledge that Plaintiff complained of discriminatory treatment.  Although

Defendants specifically argue that Plaintiff fails to allege sufficient facts to show Kammerzell was

aware she engaged in any protected activity, Plaintiff's responsive brief fails to even address Kammerzell's knowledge of her alleged complaints, much less explain on what basis the court should infer such knowledge.  (*See* Pl.'s Resp. at 24.)  This court has neither the duty nor the inclination to scan the entire record in search of support for Plaintiff's retaliation claim, particularly when Plaintiff expends only *one sentence*, without case or record citation, of her entire response brief on the claim.  *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (noting "[j]udges are not like pigs, hunting for truffles buried in [contracts]").  Considering that Defendants have pointed to competent evidence that Valdez did not relate any complaint of gender discrimination to Kammerzell, and that Plaintiff has not deigned to even *argue* that this court should infer Kammerzell did in fact have knowledge of Plaintiff's complaints, I find no reasonable juror could conclude that Kammerzell had the requisite knowledge.  *Cottrill v. Spears*, 87 F. App'x 803, 807 (3d Cir. 2004) (finding  the district court "correctly determined that plaintiff's theory essentially required it to impermissibly find defendants' affiants' testimony incredible while at the same time inferring a fact for which plaintiffs provided no evidence").  Plaintiff's speculative and conclusory allegation to the contrary is wholly insufficient to create a genuine issue of material fact.  *Hall*, 935 F.2d at 1111.  Because Plaintiff has failed to meet her *prima facie* burden of showing that Kammerzell knew of her allegedly protected opposition, I grant Defendants summary judgment on Plaintiff's retaliation claim.

    *f.*    ***Due Process***

        Lastly, Defendants argue they are entitled to summary judgment on Plaintiff's section 1983 due process claims against Kammerzell, because Plaintiff fails to allege facts sufficient to

demonstrate that Kammerzell's conduct violated the law.  (Defs.' Br. at 51–52.)  The doctrine of

qualified immunity shields government officials from individual liability when they are performing

discretionary functions that do not violate clearly established statutory or constitutional rights of

which a reasonable person would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982);

*Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001).  "Qualified immunity is an entitlement not

to stand trial or face the other burdens of litigation.  The privilege is an *immunity from suit* rather

than a mere defense to liability."  *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001) (citations

omitted) (emphasis in original).  Whether a defendant is entitled to qualified immunity is a

question of law.  *Derda v. City of Brighton*, 53 F.3d 1162, 1164 (10th Cir. 1995).  Once a

defendant claims qualified immunity, the plaintiff bears the "heavy two-part burden" of

demonstrating that: (1) the defendant's alleged actions violated a constitutional or statutory right;

and (2) the constitutional or statutory right was clearly established at the time of the alleged

violation.  *Trigalet v. Young*, 54 F.3d 645, 647 (10th Cir. 1995) (quoting *Albright v. Rodriguez*,

51 F.3d 1531, 1534 [10th Cir. 1995]).

In determining whether qualified immunity shields Kammerzell from liability, this court is

obliged to consider whether there has been a constitutional violation *before* determining whether

the law was clearly established.  *McCook v. Spring Sch. Dist.*, 44 Fed App'x 896, 902 (10th Cir.

2002) (citing *Saucier*, 533 U.S. at 201).  The goal in first answering this question is to ensure that

the law of qualified immunity does not stymie the development of constitutional law.  *See id.*

Accordingly, I now turn to the question of whether Plaintiff's allegations are sufficient to support

her section 1983 claim of due process violation.

At the outset, I note Plaintiff's second amended complaint is unclear as to whether she asserts a claim for substantive or procedural due process.  Plaintiff's responsive brief exclusively addresses a procedural due process claim.  (Pl.'s Resp. at 25–32.)  Plaintiff contends Kammerzell denied her due process rights by: (1) terminating her without just cause and the opportunity to be heard; and (2) depriving her of the opportunity to file a grievance regarding her second corrective action.  (*Id.* at 25–28.)  To the extent that Plaintiff meant to plead a section 1983 action based on a deprivation of substantive due process or deprivation of a liberty interest, she waived that argument by not raising it in her response to Defendant's motion for summary judgment on all counts.  *See Grenier*, 70 F.3d at 678.      Defendants argue summary judgment is warranted because Plaintiff failed to raise a genuine issue of material fact as to whether Kammerzell: (1) terminated her; (2) denied her a pre-disciplinary hearing; and (3) denied her the ability to file a grievance.  (Defs.' Br. at 49–51; Defs.' Reply at 33.)

When determining whether an individual was deprived of procedural due process, courts engage in a two-pronged inquiry.  *Garcia v. City of Albuquerque*, 232 F.3d 760, 769 (10th Cir. 2000).  First, in order to invoke the protection of the due process clause of the Fourteenth Amendment, a plaintiff must allege deprivation of a constitutionally protected property interest. *Id.*  A property interest includes a legitimate claim of entitlement to "some benefit created and defined by 'existing rules or understanding that stem from an independent source such as state law.'"  *Crown Point I, LLC v. Intermountain Rural Elec. Ass'n*, 319 F.3d 1211, 1216 (10th Cir. 2003) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 [1972]).  If that question is answered

in the affirmative, the court must then determine whether the government afforded the individual

an appropriate level of process.  *Garcia*, 232 F.3d at 769.

>    i.     ***Deprivation of Property Interest in Continued Employment***

Plaintiff contends she has a property interest in her continued employment and that

Kammerzell deprived her of that property interest when he constructively discharged her without

affording her the right to be heard.  (Pl.'s Resp. at 25–27.)  In the employment context, the

Supreme Court has defined "property interest" as a legitimate expectation in continued

employment.  *Roth*, 408 U.S. at 577.  Defendants acknowledge that "[a] public classified

employee may state a claim for deprivation of property without due process of law if personnel

rules create a sufficient expectancy of continued employment to give the employee a legitimate

claim of entitlement."  (Defs.' Br. at 48.)  Defendants do not deny that because Plaintiff was a

certified employee of the State of Colorado at the time she resigned from CSU, she could only be

fired for just cause.  (Pl.'s Resp. at 26–27; *see* Defs.' Br.; Defs.' Resp.)  Accordingly, Plaintiff

possessed a property right in continued employment.  *Cleveland v. Bd. of Educ. of Loudermill*,

470 U.S. 532, 538–39 (1985) (finding that because state statute entitled employees to retain their

positions absent certain malfeasance, employee possessed a property right in continued

employment).

Next, the court must determine whether Kammerzell deprived Plaintiff of this property

interest.  Tenth Circuit law makes clear that "[i]f [Plaintiff] resigned of her own free will, even

though doing so due to the actions of [D]efendants, she voluntarily relinquished her property

interest and was not deprived of her property interest without due process."  *Parker v. Bd. of*

*Regents of the Tulsa Jr. Coll.*, 981 F.2d 1159, 1162 (10th Cir. 1992). "If, however, [Plaintiff's] resignation was so involuntary it amounted to a constructive discharge, [D]efendants did deprive her of her property interest without due process." *Id.* This court must consider the totality of the circumstances to determine whether Kammerzell's conduct effectively deprived her of a "free choice" in deciding whether or not to resign. *Id.* Factors this court should consider include whether Plaintiff: (1) was offered an alternative to resignation; (2) "understood the nature of the choice [she] was given;" (3) was afforded a reasonable time in which to make the choice; and (4) was permitted to select the effective date of her resignation. *Id.* Importantly, that Plaintiff may have been faced with the unpleasant "choice between resignation [and] termination does not establish that the resignation was involuntary, unless the employer lacked good cause to believe that there were grounds for termination." *Id.*; *accord Lenz v. Dewey*, 64 F.3d 547, 552 (10th Cir. 1995).

Defendants argue that because Plaintiff initiated her resignation process and chose not to take advantage of several due process procedures available to her, Kammerzell could not have forced her to resign. (Defs.' Br. at 33–34.) Plaintiff contends she was under duress when she resigned and that Kammerzell had no just basis for seeking her termination. (Pl.'s Resp. at 25–32.)

I find the facts as alleged by Plaintiff simply do not support a finding that Kammerzell's actions stripped her of her free will in making her decision to resign. As an initial matter, I note it is undisputed that Plaintiff, not Kammerzell, proposed that she resign in exchange for having her second corrective action removed from her file. (Defs.' Br., Ex. L [8/18/04 11:59 Email], Ex. D

at 76–77 [Pl. Dep.].)  This fact alone is arguably sufficient to support a finding that Plaintiff's

resignation was voluntary.  Nonetheless, I consider the factors noted above and find three of the

four militate strongly in favor of a finding of voluntariness.

First, Plaintiff was certainly offered a choice other than resignation.  Kammerzell made

clear that if Plaintiff did not resign, he would "file the second corrective action and begin

disciplinary/termination action."  (Pl.'s Resp., Ex. 18 [8/19/06 1:05 Email].)  "[T]he mere fact

that the choice is between comparably unpleasant alternatives — *e.g.*, resignation or facing

disciplinary charges — does not of itself establish that a resignation was induced by duress or

coercion, hence was involuntary."  *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 174 (4th

Cir. 1988).

Second, objective evidence suggests Plaintiff understood the nature of the choice she

faced.  Plaintiff's email to Kammerzell, which she composed alone, in her own office, explicitly

stated that she was willing to offer her resignation in exchange for her second corrective action

being removed from her file.  (Defs.' Br., Ex. L [9/18/04 11:59 Email].)  Further, Plaintiff deftly

negotiated the terms of her resignation, requesting that: (1) her corrective action be destroyed; (2)

her resignation be kept confidential until her departure date; (3) questions regarding her

performance not be answered negatively; and (4) she be allowed to stay with the Business Office

until she found another job.  (*See id*, Ex. L [8/18/04 11:59 Email]; Pl.'s Br., Ex. 18 [8/19/04

12:49 Email].)  Plaintiff was granted all but her last request.  (Defs.' Br., Ex. L [8/18/04 2:06

Email]; Pl.'s Br., Ex. 18 [8/19/04 1:05 Email].  Plaintiff's careful negotiation of the terms of her

resignation, as well as her statement in an email to Kammerzell that "I have come to realize I am

going to become unemployed either way," would only permit a reasonable juror to find that Plaintiff understood the nature of her choice. (*Id.*, Ex. O [8/19/04 Email].) This conclusion is bolstered by Plaintiff's account of her extensive discussion with Valdez and Smith regarding her potential resignation. (*Id.*, Statement of Undisputed Facts ¶ 57; *admitted in relevant part at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶ 57; *id.*, Ex. D at 72–74 [Pl. Dep.].) During the course of these meetings, Plaintiff was informed that disobeying a direct order from a superior to change her schedule was grounds for termination. (*Id.*, Ex. D at 70–77 [Pl. Dep.]; Pl.'s Resp., Ex. 2 ¶ 21 [Pl. Aff.].) Further, Plaintiff was told that resigning may be a good choice for her because it would aid in transferring to another job within CSU and may allow her to negotiate for removal of the second corrective action from her file. (Defs.' Br., Ex. D at 70-77 [Pl. Dep.].) In spite of Plaintiff's claim that she did not think her offering to resign would result in her actual resignation, the undisputed evidence in this case can only support a conclusion that Plaintiff understood the nature of her choice in this case.

Third, although Plaintiff was only afforded a day and a half to make her decision regarding whether to resign or face disciplinary proceedings, I find the particular facts of this case support a finding that she had a reasonable amount of time in which to make the decision. First, it was Plaintiff who started the clock running by offering to resign. Second, it was Plaintiff who asked for additional time to consider whether to follow through with her offer to resign, and it was she who asked for only one additional day to make her decision. (*Id.*, Ex. M [8/18/04 3:45 Email].) Finally, Plaintiff asked for and was granted the right to speak with advisors — Valdez and Smith — on two separate occasions for several hours during the course of her day and a half of

deliberations.  (*Id.*, Statement of Undisputed Material Facts ¶¶ 53, 57; *admitted in relevant part at* Pl.'s Resp., Objection to Statement of Undisputed Facts ¶¶ 53, 57.)  Accordingly, I find Plaintiff was afforded a reasonable time in which to decide whether to resign.

Regarding the fourth factor, on August 18, 2004, when Plaintiff initially proposed resigning, she requested to work though September 8, 2004.  (*Id.*, Ex. L [08/18/04 11:59 Email].) Kammerzell essentially granted that request, in that he agreed to allow her to stay on payroll until that date, but made her final working day August 20, 2004.  (*Id.*)  On August 19, 2004, Plaintiff then requested to be permitted to resign after she found another job.  (*Id.*, Ex. O [8/18/04 12:49 Email].)  Kammerzell denied this request.  (Pl.'s Resp., Ex. 18 [8/19/04 1:05 Email].)  Reading the facts in the light most favorable to Plaintiff, I find this factor offers minimal help to Plaintiff's duress claim.  The other factors weigh persuasively in favor of a finding of voluntariness.

Finally, I find Plaintiff has failed to plead sufficient facts to allow a reasonable juror to conclude that Kammerzell did not have good cause to believe there were grounds for her termination.  *Cf. Schultz v. U.S. Navy*, 810 F.2d 1133, 1136–37 (Fed. Cir. 1987) (resignation involuntary when induced by threat of termination and where employer lacked good faith basis for believing cause existed).  The undisputed facts before the court show that the second corrective action, which focused on Plaintiff's alleged failure to comply with a schedule change, was the proverbial straw that broke the camel's back and put Plaintiff in a position to have to choose between resignation and possible termination.  (Defs.' Br. at 27–29; Pl.'s Resp. at 29–32.) Plaintiff argues Kammerzell had no basis for giving her this corrective action, suggesting he did not have a good faith belief that there were grounds for her termination.  (Pl.'s Resp. at 29–32.)

-53-

Plaintiff's account of the facts surrounding the schedule change at issue are contradictory, to say the least: (1) in one paragraph of her responsive brief, Plaintiff denies that Kammerzell directed her to work Mondays at all, (*id.*, Objection to Statement of Undisputed Facst ¶ 40); (2) in another paragraph of her responsive brief, Plaintiff states Kammerzell told her to begin working Mondays in three weeks, apparently starting August 16, 2004, (*id.*, Objection to Statement of Undisputed Facts ¶ 43); (3) in her deposition, Plaintiff stated she did not recall whether or not Kammerzell told her she had to begin working Mondays, (Defs.' Br., Ex. D at 63 [Pl. Dep.]); and (4) in her affidavit she admitted that Kammerzell asked her to start working on Mondays until 5:00 P.M., but stated "[h]e was vague about whether I had to do it and never said why," (Pl.'s Resp., Ex. 2 ¶ 13 [Pl. Aff.]).  Plaintiff's claims in her responsive brief — that Kammerzell did not direct her to begin working late on Mondays and, confoundingly, that Kammerzell told her to start working late on Mondays beginning three weeks from the date of their discussion — are supported by reference to portions of Plaintiff's deposition showing only that Plaintiff apparently does not recall whether Kammerzell told her to change her schedule.  (*See id.*, Ex. D at 62–63 [Pl. Dep.].)  Thus, Plaintiff's contention that Kammerzell definitively did not tell her to start working late on Mondays is an unsupported, conclusory allegation, which is wholly unpersuasive in determining a motion for summary judgment.  *Hall*, 935 F.2d at 1111.

Kammerzell, on the other hand, states in his affidavit that he "directed [Plaintiff] that she needed to work the hours of 8:00 A.M. to 5:00 P.M. on Mondays beginning August 9, 2006." (Defs.' Br., Ex. A ¶ 22 [Kammerzell Aff.].)  Plaintiff's failed memory does not serve to create a genuine issue of material fact in light of Kammerzell's affidavit and the second corrective action,

both of which explicitly state Plaintiff was to begin working Mondays on August 9, 2006.  *Cf.*

*Cottrill v. Spears*, 87 F. App'x 803, 807 (3d Cir. 2004) (finding the district court "correctly

determined that plaintiffs' theory essentially required it to impermissibly find defendants' affiants'

testimony incredible while at the same time inferring a fact for which plaintiffs provided no

evidence").  Based on the foregoing, I find no reasonable juror could conclude that Plaintiff was

forced to resign.  Because she resigned of her own free will, Plaintiff "voluntarily relinquished her

property interest[,] was not deprived of her property without due process," and had no

constitutional right to a hearing.  *Parker*, 981 F.2d at 1162.

### ii.     *Deprivation of the Opportunity to File a Grievance*

Defendants contend Plaintiff pleads no facts supporting her claim that Kammerzell deprived her of an opportunity to file a grievance regarding her corrective actions and her alleged constructive discharge. (Defs.' Br. at 49–51.)  I have already determined that Plaintiff voluntarily resigned and, thus, cannot claim a due process violation based on a theory of constructive discharge. (*See Analysis* § 2[f][i], *supra.*)  Generously assuming for the purposes of this motion, as Defendants appear to do, that Kammerzell deprived Plaintiff of a protected property interest when he filed the corrective actions against her, I find Plaintiff has failed to create a genuine issue of material fact as to whether Kammerzell denied her the opportunity to file a grievance. (*See* Defs.' Br. at 49–51.)  Importantly, Plaintiff does not argue the grievance procedures available at CSU were inadequate, only that she was denied the right to use them. (*See* Pl.'s Resp. at 27–28.)

An "essential allegation" of a section 1983 claim is "[p]ersonal participation" by the defendant. *Bennett v. Passic*, 545 F.2d 1260, 1262–63 (10th Cir. 1976).  This means that Kammerzell can only be held responsible for the conduct of himself or his subordinates if he was "personally involved in the constitutional violation" and a "sufficient casual connection . . . exist[s] between the supervisor and the constitutional violation." *Serna v. Colo. Dep't of Corrs.*, 455 F.3d 1146, 1151 (10th Cir. 2006) (internal quotations omitted).  As Defendants point out, Plaintiff fails to come forth with even an *allegation*, much less supporting evidence, that Kammerzell was personally involved in preventing Plaintiff from filing a grievance. (*See* Pl.'s Resp.)  She does not allege that Kammerzell told her she could not file a grievance,

directed someone else to tell Plaintiff she could not file a grievance, or in any specific way inhibited Plaintiff from filing a grievance. (*See id.*)  In fact, all evidence suggests that Plaintiff had ample access to advisors, other than Kammerzell, regarding her work-related issues.  Plaintiff only alleges that her appointment with Dr. Powers to grieve the second corrective action was cancelled.  (Defs.' Br., Ex. D at 92–93 [Pl. Dep.].)  Yet, Plaintiff admits that she does not know that anyone at the Business Office, much less Kammerzell, cancelled the meeting or directed that it be cancelled.  (*Id.*)  Based on the foregoing, I find no reasonable juror could conclude that Kammerzell denied Plaintiff the opportunity to file a grievance at any time.

Because Plaintiff has failed to present sufficient evidence to support a finding of forced termination or Kammerzell's involvement in denying her the opportunity to file a grievance, Kammerzell cannot be said to have violated a clearly established right.  Thus, Defendants are entitled to summary judgment on Plaintiff's section 1983 due process claim against Kammerzell.

**3.     *Conclusions***

Based on the foregoing it is therefore

ORDERED as follows:

1.      Defendants' motion (#36) for summary judgment is GRANTED.

2.      The clerk shall forthwith enter judgment in favor of Defendants and against

Plaintiff, dismissing the case with prejudice.  Defendants may have its costs by filing a bill of costs within eleven days of the date on which this order is filed.

Dated this 9th day of July, 2007.


BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge